FILED

04/27/2021

Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs February 3, 2021

**STATE OF TENNESSEE v. DAMON JOHNSON**

**Appeal from the Criminal Court for Shelby County**
**No. 17-04436, C1704748   W. Mark Ward, Judge**

_____

**No. W2020-00260-CCA-R3-CD**

_____

A Shelby County jury convicted the defendant, Damon Johnson, of second-degree murder, and the trial court imposed a sentence of twenty-four years' incarceration.  On appeal, the defendant challenges the sufficiency of the evidence supporting his conviction, argues the trial court improperly commented on his right not to testify, and asserts the trial court erred in sentencing.  Following our review of the briefs, the record, and the applicable law, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

J. ROSS DYER, J., delivered the opinion of the court, in which D. KELLY THOMAS, JR. and CAMILLE R. MCMULLEN, JJ., joined.

Jeffrey Lee (at trial) and Sharon Fortner (at trial and on appeal), Memphis, Tennessee, for the appellant, Damon Johnson.

Herbert H. Slatery III, Attorney General and Reporter; Brent C. Cherry, Senior Assistant Attorney General; Amy P. Weirich, District Attorney General; and Glenda Adams and Holly Palmer, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

*Procedural and Factual History*

This case arises after the defendant, Damon Johnson, fired multiple shots at the victim, Rashed Awwad, outside of a Boost Mobile store in Shelby County, Tennessee.  The defendant was charged with one count of second-degree murder and prior to trial, filed

notices of his intent to rely on the general defenses of self-defense and defense of others. Tenn. Code Ann. § 39-13-210. The parties presented the following evidence at trial.

On May 15, 2017, the victim worked at a family-owned Boost Mobile store ("the store") where he interacted with the defendant four separate times. The defendant's first three visits to the store to have his cell phone repaired were uneventful. The fourth visit, however, resulted in the victim's death. Brothers Rodtrez Banis and Laderius Dowell and their cousin, Jaquez Glenn, accompanied the defendant to the store on the fourth visit. Mr. Banis, Mr. Dowell, and Mr. Glenn each testified at trial and provided similar descriptions of the events leading up to the victim's death.

Mr. Banis stated the group walked to the store from the nearby King Gate Apartments. At the store, the defendant asked the victim if his cell phone was repaired, and the victim stated it was not. Because this was the defendant's fourth visit to the store, Mr. Glenn "got mad" and "had an altercation" with the victim. According to Mr. Banis, the victim threatened Mr. Glenn, telling him to leave the store or the victim would "shoot" or "kill" Mr. Glenn. Mr. Glenn exited the store but remained in the parking lot.

When Mr. Banis, Mr. Dowell, and the defendant also exited the store, the victim followed, holding a cigarette and laughing. Outside, Mr. Glenn and the victim engaged in another verbal altercation for several minutes. Mr. Banis intervened by stepping in between Mr. Glenn and the victim. Mr. Banis did not see Mr. Glenn or the victim with a gun but noted the victim "had his hand on his pocket." At the time, Mr. Banis did not believe anyone in his group was armed.

After the verbal altercation, Mr. Banis, Mr. Dowell, and Mr. Glenn began walking away from the store as the defendant fired approximately eight or nine shots at the victim. When the defendant began shooting, Mr. Banis was "more than surprised" and scared. Mr. Banis and Mr. Dowell ran to the King Gate Apartments where they told their father about the shooting. Mr. Banis subsequently turned himself into law enforcement and provided a statement. Though he was unable to identify the defendant in a photographic lineup, Mr. Banis identified the defendant during trial.

After reviewing his statement at trial, Mr. Banis recalled telling law enforcement that he believed the victim had a gun at the time of the altercation because the victim "was threatening too much, he was saying too much stuff that had me thinking he had one." When asked if he saw a gun on the victim's hip, Mr. Banis stated, "I mean, he had his hand by his pocket so I couldn't tell. I saw something, but I don't know." Further, Mr. Banis recalled that when the victim threatened Mr. Glenn, the defendant told the victim that "he can't be doing that, you can't be threatening nobody. He said, if you're going to say

something you got to say it man to man." Ultimately, Mr. Banis confirmed that he did not see the victim with a gun, either inside or outside of the store.

Similarly, Mr. Dowell stated the victim and Mr. Glenn got into an argument which resulted in Mr. Glenn exiting the store, and the victim telling the group not to return with Mr. Glenn. Mr. Dowell noted he saw a gun on the victim's hip while inside the store but the victim did not pull the gun out at the time. Despite the victim's interactions with Mr. Glenn, Mr. Dowell stated he did not feel threatened.

When the group exited the store and joined Mr. Glenn in the parking lot, the victim followed, holding a cigarette. The victim continued arguing with Mr. Glenn, stating "don't bring his 'b**** a**' back to my store." The defendant began shooting, and Mr. Dowell ran home and discussed the shooting with his father. Mr. Dowell stated he did not see a weapon until the defendant began shooting.

Mr. Dowell reviewed the statement he provided to law enforcement wherein he identified the defendant as the shooter. Mr. Dowell explained the defendant "just started shooting" as Mr. Dowell held Mr. Glenn from the victim. In the statement, when asked if the victim had a gun, Mr. Dowell stated, "I don't know, it looked like he reached for one." Mr. Dowell explained that he told police he saw the victim with a gun while inside the store though that information was not included in his statement. His statement did include Mr. Dowell telling the police that he did not see the victim pull a gun nor did he see the victim with a gun outside of the store. Mr. Dowell identified the defendant in a photographic lineup. Under the defendant's photograph, Mr. Dowell wrote, "This is D. J. mafia go to my Boost Mobile Store, I seen D. J. pull a gun and shoot a man."

Mr. Glenn also testified, explaining prior to the shooting, he "traded words" with the victim and "got evicted out of the store." More specifically, Mr. Glenn explained that the victim overheard him comment on the victim's inability to repair the defendant's cell phone. The comment angered the victim who stated, "F*** you b**** a** n*****." When Mr. Glenn called the victim a "b****," the victim told Mr. Glenn to leave the store. Mr. Glenn complied and waited for his group in the parking lot.

The victim followed the group outside, "complaining and arguing." Mr. Glenn told the victim that he "didn't have a problem with him," but the victim continued to argue. Despite the argument, Mr. Glenn stated that he was not being aggressive and that no one had to hold him back from the victim. Mr. Glenn eventually walked away, noting as he did so, the victim was angry and had one hand in the air with the other hand on his hip or pocket. Mr. Glenn then saw the defendant fire multiple shots at the victim. He described the shooting as unexpected and shocking.

After the shooting, Mr. Glenn and the defendant ran to the King Gate Apartments, and Mr. Glenn and his girlfriend dropped the defendant off at the home of Jessica Hunter, the defendant's friend. Mr. Glenn described the defendant as "real nervous, he was scared and he repeated that he messed up, like he was very nervous and saying like, I guess the police going to try to kill him, or something for what he did." Mr. Glenn later turned himself into law enforcement, provided a statement, and identified the defendant in a photographic lineup. Underneath the defendant's picture, Mr. Glenn wrote, "This is Damon Johnson who I saw shoot the man who worked at Boost Mobile."

Guy Brinkley and Nadia Tippett were near the store when the shooting occurred. Ms. Tippett witnessed the shooting from her car while parked in the lot next to the store. Ms. Tippett saw the defendant point a gun at the victim, who was not holding a weapon and "had his hands up in the air." As the defendant ran away, Ms. Tippett saw the defendant shoot the victim. Mr. Brinkley, who worked next door to the store, heard approximately six gunshots, armed himself with a pistol, and ran outside where he saw the victim sitting on the ground. The victim indicated he had been shot, asked Mr. Brinkley to call 9-1-1, and handed a gun to Mr. Brinkley. Mr. Brinkley noted the gun had not been fired but did not recall from where the victim pulled the gun. Mr. Brinkley stated, "[The victim] got [the gun] from somewhere, . . . I don't know if it was his pocket, or behind him, or under him, or in his pants, he wasn't holding it in his hand when I walked out, he picked it up and handed it to me." Mr. Brinkley later provided the victim's gun to law enforcement, and Ms. Tippett provided a statement.

Several Memphis Police Department (MPD) officers responded to the scene and participated in the investigation. Upon his arrival, Officer Christopher Robertson secured the scene and saw the victim on the ground, "unresponsive[,] and clinging on to life." MPD Officer Demar Wells photographed and processed the scene and created a crime scene sketch which was entered into evidence. Officer Wells located a bloodied shirt, observed multiple bullet holes in the door of the store, and saw spent shell casings to the east of the store's door. He collected eight, "R.P. brand" shell casings and six bullet projectiles all of which were entered into evidence. Officer Hearns, who did not testify at trial, collected the victim's black, Smith & Wesson, semi-automatic pistol and five, "PMC brand," live rounds from the scene which were entered into evidence. Officer Wells did not locate any "PMC" spent shell casings at the scene. Photographs of the scene and the evidence collected were entered into evidence.

MPD Sergeant David Beckham served as the lead homicide investigator into the victim's death. During Sergeant Beckham's testimony, the State played surveillance footage from the store which was collected by MPD Officer Andrew Kosso. According to Sergeant Beckham, the footage showed the victim arguing with Mr. Glenn as Mr. Dowell and Mr. Banis held Mr. Glenn back. The defendant then approached the victim and shot

him.  Sergeant Beckham stated that the victim "never had a weapon in his possession until the very end, after he was shot and on the ground" and noted in the footage when the victim pulled his gun from his waistband and/or pocket after being shot.  Rebecca Gross, a digital evidence supervisor for the Shelby County District Attorney's office, enhanced the surveillance footage by increasing the audio, zooming in on the scene, and slowing down the footage.  Ms. Gross's enhancements resulted in three video clips which were also entered into evidence and played for the jury.  As the video clips played, Ms. Gross testified that she did not observe a gun in the victim's hands during the shooting.

As the investigation progressed, Sergeant Beckham obtained statements from Mr. Glenn and Mr. Dowell, who implicated the defendant in the crime.  MPD Detective Jesus Perea participated in searching for the defendant which led him to the home of Jessica Hunter on May 16, 2017.  Though he did not locate the defendant at Ms. Hunter's home, Detective Perea found items of clothing that matched those worn by the defendant in the surveillance footage, and Ms. Hunter admitted the defendant had been at her home and changed his clothes.  Ms. Hunter testified to the same at trial, and photographs of the defendant's clothing and shoes found in Ms. Hunter's home were entered into evidence.  Ms. Hunter further stated that while at her home after the shooting, the defendant was scared and told her that he "messed up" and "that he had an incident and he shot somebody."

The defendant ultimately turned himself into law enforcement.  On May 17, 2017, Sergeant Beckham obtained a statement from the defendant.  Sergeant Beckham also stated that the defendant's gun was not recovered and that the defendant was not licensed to carry a weapon.

Dr. Marco Ross performed the autopsy of the victim, noting the victim suffered four gunshot wounds to his back with four entrance wounds but only two exit wounds.  As such, Dr. Ross located two bullets inside the victim's body during the autopsy.  From the wounds, the victim suffered significant blood loss and injury to his ribs, spine, liver, chest, intestines, abdomen, spleen, and stomach.  Dr. Ross's autopsy report, photographs, and a diagram of the victim's injuries were entered into evidence.  The victim's cousin, Wisam Abualya, also identified the victim in photographs which were entered into evidence.

The State then rested its case-in-chief, and the defendant moved for a judgment of acquittal.  After denying the motion, the trial court conferred with the parties regarding the jury instructions, including the defendant's oral and written request for an instruction on self-defense and defense of others.  Based upon the proof presented, the trial court indicated it did not plan to charge self-defense though it would charge defense of others.  After the discussion, defense counsel met with the defendant who decided to testify on his own

behalf. The trial court conducted a *Momon* hearing, and the defendant presented the following testimony.

The defendant described May 15, 2017, as "the day that I killed the clerk and it changed my life." The defendant explained that on his fourth trip to the store to have his cell phone repaired, Mr. Glenn stated that the victim "must not know what he is doing." The victim overheard Mr. Glenn's comment, "pitched" the cell phone and stated he would not repair it, and told Mr. Glenn to exit the store. Mr. Glenn and the victim exchanged words, but Mr. Glenn ultimately left the store. The defendant then asked the victim to speak with him "man to man" regarding the cell phone, noting the victim was being aggressive at the time. The defendant and the victim agreed the defendant would return to the store the following morning in order to repair the cell phone. The defendant believed the situation had calmed but admitted he carried a loaded gun in his gym shorts during this interaction.

The defendant, Mr. Dowell, and Mr. Banis then exited the store, and the victim stated, "Do not bring [Mr. Glenn] back to my store, he will get shot." The defendant responded, stating "I told [the victim], this is my brother, you saying you going to shoot him, it's like saying you will shoot me." The defendant began walking away from the store, but when he stopped and turned around, he saw the victim and Mr. Glenn arguing again. The defendant described the victim as "showing aggression," "his face was red," and "he came outside like he had something to prove." The victim began asking Mr. Glenn, "Whatcha wanna do, whatcha wanna do?" The victim put his hands down toward his sides and placed one of his hands "in a wild, wild west position." The defendant stated he saw a gun, and the victim then "reached for the gun" while still arguing with Mr. Glenn. The defendant "froze immediately," stating "fear overcame" him. He recalled the threat the victim previously made regarding Mr. Glenn. Upon seeing the victim "go for his gun," the defendant began shooting the victim.

The defendant admitted to firing multiple shots, believing his "life was in danger, as well as [his] family." The defendant was unsure if he hit the victim as the victim did not immediately fall to the ground. The defendant believed the victim "was still trying to go for the gun," but when the victim eventually fell, the defendant "froze." After seeing the victim pull his gun out, the defendant ran. The defendant did not see the victim put his gun on the ground but he was "pretty sure" the victim's gun was loaded based upon "the threats he was making." The defendant admitted to shooting the victim but stated he did so because he was "[i]n fear for [his] life, as well as the people that was (sic) around [him]."

The defendant ran to the King Gate Apartments where he and Mr. Glenn "jumped in" Mr. Glenn's girlfriend's car. Mr. Glenn and his girlfriend took the defendant to Ms. Hunter's home where he left his shirt and shoes. The defendant also admitted to burning

the pants he wore during the shooting. The next morning, the defendant sold the gun he used to shoot the victim, explaining "[a]t that time I was scared for my life, because I felt like the police was going to try to say that I was armed and dangerous and do something to me."

The defendant eventually turned himself into law enforcement, provided a statement, and admitted to shooting and killing the victim. At trial, the defendant suggested law enforcement pressured and "forced" him into providing a statement despite admitting to signing a waiver. The defendant explained that during the statement, he repeatedly informed officers that he "feared for [his] life and [he] saw a gun." However, upon reviewing his statement on May 17, 2017, the defendant noted this information was not included. As a result, the defendant added "that [he] saw a gun" to his statement before signing the same.

During cross-examination, the defendant admitted to walking towards the victim "to try to dissolve the situation" prior to the shooting. The defendant stated his mind was "on survival mode" as he shot because he saw the victim reach to his side. The defendant claimed Ms. Tippett lied during her testimony by stating the victim's hands were in the air prior to the shooting and that Mr. Banis and Mr. Dowell lied when they testified that the group was walking away from the victim as the defendant started shooting. The defendant again stated he saw the victim grab a gun before he shot and that he told the police this information while providing a statement. The defendant acknowledged that when asked by police during his statement what the victim was doing when the defendant fired the first shot, the defendant responded, "I don't remember all that, he looked like he was trying to grab his gun."

The defendant further testified he purchased the gun he used to shoot the victim after his first visit to the store and carried the gun with him during each subsequent visit. The defendant admitted he did not have a gun license. Finally, the defendant stated that after reviewing his statement on May 17, 2017, he added the following: "I saw the gun on the guy." The defendant's entire statement was entered into evidence. The defendant offered no additional proof.

The State presented rebuttal proof from Sergeant Beckham who explained the defendant agreed to provide a statement after being *Mirandized*. In his statement, the defendant detailed the argument between the victim and Mr. Glenn and noted that immediately before the shooting, Mr. Banis and Mr. Dowell were "pulling [Mr. Glenn] off" the victim. The defendant explained he told Mr. Banis and Mr. Dowell to let Mr. Glenn go, and then the defendant "panicked and he approached the victim and shot him." Sergeant Beckham further stated that the defendant "said that the victim never touched a gun at any time during his interview, or statement." However, the defendant "backtracked"

and ultimately stated he "saw a bit of a gun." According to Sergeant Beckham, the defendant "never mentioned a gun the first time [officers] asked him what happened" but the defendant "got a look like, I just messed up and he back tracked and he said, [']I saw the tip of a gun.[']" Though the defendant stated he saw the tip of the gun before the shooting, he also stated the victim never touched the gun. Sergeant Beckham noted the defendant edited his formal statement to include, "I saw the gun on the phone guy."

The State again rested, and the trial court included the defenses of self-defense and defense of others in charging the jury. After deliberating, the jury convicted the defendant of second-degree murder for which the trial court imposed a twenty-four-year sentence to be served in the Tennessee Department of Correction. This timely appeal followed.

## *Analysis*

### I. *Sufficiency of the Evidence*

The defendant argues the evidence is insufficient to support his conviction for second-degree murder, asserting "[t]his was clearly a case of self-defense," and, as a result, the victim's death "was legally justified." The State argues sufficient evidence exists to support the defendant's conviction and to "overcome the defendant's claim of self-defense," and we agree.

When the sufficiency of the evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also* Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); *State v. Evans*, 838 S.W.2d 185, 190-92 (Tenn. 1992); *State v. Anderson*, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. *See State v. Pappas*, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). Our Supreme Court has stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given

> to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 212 Tenn. 464, 370 S.W.2d 523 (1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing *State v. Brown*, 551 S.W.2d 329, 331 (Tenn. 1977); *Farmer v. State*, 343 S.W.2d 895, 897 (Tenn. 1961)). The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008) (citing *Byrge v. State*, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence and the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence are questions primarily for the jury. *Dorantes*, 331 S.W.3d at 379 (citing *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006)). This Court, when considering the sufficiency of the evidence, shall not reweigh the evidence or substitute its inferences for those drawn by the trier of fact. *Id.*

The jury convicted the defendant of second-degree murder. Second-degree murder is the "knowing killing of another" and is a result-of-conduct offense. Tenn. Code Ann. § 39-13-210(a)(1); *State v. Page*, 81 S.W.3d 781, 787 (Tenn. Crim. App. 2002). A person acts knowingly "when the person is aware that the conduct is reasonably certain to cause the result." Tenn. Code Ann. § 39-11-302(b). "[T]he 'nature of the conduct' that causes death is inconsequential." *Page*, 81 S.W.3d at 787 (quoting *State v. Ducker*, 27 S.W.3d 889, 896 (Tenn. 2000)). Thus, a knowing intent is shown if the defendant acts with an awareness that his conduct is reasonably certain to cause the victim's death. *See id.* at 790-93. Whether a defendant acted "knowingly" is a question of fact for the jury. *State v. Inlow*, 52 S.W.3d 101, 104-105 (Tenn. Crim. App. 2000). In assessing the defendant's intent, the jury may rely on "the character of the assault, the nature of the act and [on] all the circumstances of the case in evidence." *Id.* at 105 (citing *State v. Holland*, 860 S.W.2d 53, 59 (Tenn. Crim. App. 1993)).

The defendant contends he shot and killed the victim "in self-defense after the victim threatened to shoot his friend, Jacquez Glenn, and then began reaching for a gun that was on the victim's hip." The record, however, does not support the defendant's claim of self-defense. Rather, the record indicates that on May 15, 2017, the defendant visited the store four times where he interacted with the victim. After the initial visit, the defendant purchased a gun. The defendant then carried the gun with him during each subsequent visit to the store. Mr. Dowell, Mr. Glenn, and Mr. Banis accompanied the defendant on the fourth visit during which Mr. Glenn and the victim engaged in a verbal altercation. The victim asked Mr. Glenn to leave the store, Mr. Glenn complied, and the victim told the group not to return with Mr. Glenn.

The group then exited the store, and the victim followed the men outside where the victim and Mr. Glenn continued to argue. The defendant saw the argument, approached the victim, and shot him numerous times in the back. Mr. Glenn, Mr. Dowell, and Mr. Banis were shocked by the defendant's actions and immediately ran from the scene. Ms. Tippett testified that the victim had his hands in the air prior to the shooting and that the victim was not holding a gun before being shot. After the shooting, Mr. Brinkley aided the victim who handed him a gun from his waistband or pocket.

The defendant fled the scene, changed his clothing and burned the pants he wore during the shooting, and sold the gun he used to kill the victim. The defendant told Ms. Hunter and Mr. Glenn that he messed up. During the investigation, Mr. Glenn and Mr. Dowell identified the defendant in a photographic lineup as the shooter. Law enforcement obtained video footage of the defendant's crime which showed the moments immediately before and after the shooting. The video footage corroborated the testimony of the State's witnesses, including Sergeant Beckham, who testified that the victim did not pull his gun out until after he had been shot and had fallen to the ground. Officer Wells located eight "RP brand" shell casings and six bullet projectiles at the scene, and noted he did not locate any "PMC brand" shell casings, like those found in the victim's gun, at the scene. Dr. Ross testified the victim suffered four gunshot wounds to his back which resulted in his death. The defendant ultimately admitted he shot the victim to Ms. Hunter, law enforcement, and the jury.

Viewing the evidence in the light most favorable to the State, the record indicates the defendant fired numerous shots at the victim which resulted in his death, and the defendant admitted to the same. Based upon this evidence, the jury was at liberty to infer the defendant knew that firing a gun in the direction of the victim was reasonably certain to cause the victim's death. *Inlow*, 52 S.W.3d at 105. Accordingly, sufficient evidence exists to show the defendant "knowingly" shot and killed the victim.

The defendant argues the State failed to overcome his defense of self-defense. However, as noted above, the record shows the defendant shot the victim four times in the back after the victim engaged in a verbal altercation with Mr. Glenn. The record is absent any evidence demonstrating that the victim threatened the defendant or that he was even holding a gun prior to the shooting. Though the defendant testified that he feared for his life prior to shooting the victim, the jury clearly rejected this testimony. *See State v. Tanya Nicole Slimick*, No. M2014-00747-CCA-R3-CD, 2015 WL 9244888, at *12 (Tenn. Crim. App. Dec. 17, 2015) (citations omitted) ("Whether a defendant was acting in self-defense is a question of fact for the jury."). Accordingly, the defendant's arguments asserting he shot and killed the victim in self-defense are without merit, the evidence produced at trial is more than sufficient to sustain the defendant's conviction, and the defendant is not entitled to relief.

## II. Self-defense

The defendant argues the trial court improperly commented on his right not to testify by suggesting the defendant "would have to testify if he wanted to use self-defense as a defense in his case." The defendant asserts "the waiver of his right to testify was not knowing, intelligent, [or] voluntary" as a result. The State suggests "[t]he trial court did not deny the defendant his right not to testify, but properly informed him that the evidence presented in the State's case in chief did not support an instruction on self-defense, and that unless the defendant provided such evidence during his testimony, the instruction would not be given." The State further notes the trial court conducted a proper *Momon* hearing after which the defendant chose to testify. Upon our review, we agree with the State.

The Fifth Amendment to the United States Constitution provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. Similarly, article I, section 9 of the Tennessee Constitution provides that "in all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself." Tenn. Const. art. I, § 9. Both provisions guarantee criminal defendants the unfettered right to remain silent and not testify at trial. *Carter v. Kentucky*, 450 U.S. 288, 305 (1981).

A defendant also has a right to a correct and complete jury charge. *State v. Garrison*, 40 S.W.3d 426, 432 (Tenn. 2000). This right is constitutional in nature. *State v. Phipps*, 883 S.W.2d 138, 142 (Tenn. Crim. App. 1994). The trial court must present the propositions of law governing the case plainly to the jury, in such a manner as to enable them to comprehend the principles involved. *State v. Williamson*, 919 S.W.2d 69, 80 (Tenn. Crim. App. 1995). "Nothing short of this will 'satisfy the demands of justice' or the defendant's right to a jury trial." *Id.* (quoting *Crawford v. State*, 44 Tenn. 190, 195 (1867)).

The general defense of self-defense "need not be submitted to the jury unless it is 'fairly raised by the proof.'" *State v. Hawkins*, 406 S.W.3d 121, 129 (Tenn. 2013) (quoting Tenn. Code Ann. § 39-11-203(c) (2010)). "The quantum of proof necessary to fairly raise a general defense is less than that required to establish a proposition by a preponderance of the evidence." *Id.* Thus, in order "[t]o determine whether a general defense has been fairly raised by the proof, a court must consider the evidence in the light most favorable to the defendant and draw all reasonable inferences in the defendant's favor." *Id.* If a general defense is fairly raised, "the trial court is required to submit the general defense to the jury." *Id.* The burden lies with the defendant to introduce "'admissible evidence that a defense is applicable'" and "'[i]f the defense is at issue, the state must prove beyond a reasonable doubt that the defense does not apply.'" *Tanya Nicole Slimick*, 2015 WL 9244888, at \*16 (quoting Tenn. Code Ann. § 39-11-203, Sentencing Comm'n Cmt.).

"Whether a defendant was acting in self-defense is a question of fact for the jury." *Id.* at \*12 (citations omitted). Our self-defense statute provides:

> (b)(1)  Notwithstanding § 39-17-1322, a person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force against another person when and to the degree the person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force.
>
> (2) Notwithstanding § 39-17-1322, a person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force intended or likely to cause death or serious bodily injury, if:
> (A) The person has a reasonable belief that there is an imminent danger of death or serious bodily injury;
> (B) The danger creating the belief of imminent death or serious bodily injury is real, or honestly believed to be real at the time; and
> (C) The belief of danger is founded upon reasonable grounds.

Tenn. Code Ann. § 39-11-611(b)(1), (2). "The jury must determine the reasonableness of the defendant's belief that deadly force was required to protect against the imminent danger of death or serious bodily injury." *Tanya Nicole Slimick*, 2015 WL 9244888, at \*13 (citations omitted). The "[c]ircumstances surrounding the offense may show the genuineness of the defendant's fear." *Id.* (citation omitted). However, "[t]he defendant's conduct and mental state must meet an objective standard of reasonableness in order for the homicide to be justified." *Id.* (citing *State v. Bult*, 989 S.W.2d 730, 732 (Tenn. Crim.

App. 1998)). "Self-defense 'is not limited to the exact moment of the assault that may be considered in connection with the entirety of the events leading to the assault.'" *Id.* (quoting *State v. Ivy*, 868 S.W.2d 724, 727 (Tenn. Crim. App. 1993)). "Self-defense is a complete defense against a murder charge." *Hawkins*, 406 S.W.3d at 128 (citation omitted).

Here, the defendant asserts "[s]elf-defense should have been an option as a jury instruction regardless of whether [he] testified or not," and "by telling [the defendant] that he had to testify in order to include self-defense in the jury instructions, the [t]rial [court] violated the [defendant's] Fifth Amendment right." The defendant asserts, "[b]ecause there was previous testimony from other witnesses presented by the State that the victim had a gun, that he threatened to use the gun against one of the witnesses, and that the victim had his hand on or near his gun while arguing with the group outside, it was error for the [t]rial [c]ourt to admonish [the defendant] and compel him to testify in his own defense if he wanted to include a self-defense jury instruction." The State argues that the "true meaning" of the trial court's comment "was that unless the defendant provided some evidence to support a self-defense instruction, the instruction was not warranted" as "there was no testimony that [the victim] had a gun in his hand when the defendant shot him four times in the back." After a thorough review of the record, we agree with the State.

At the close of the State's proof, the trial court engaged in a discussion with the parties regarding the self-defense instruction which was requested, both orally and in writing, by the defendant. The following exchange occurred:

[Defense Counsel]: Judge, I've prepared a written motion and I wanted to pass forward and I would like an instruction on self-defense included in your jury instructions. And, I do have a stapled language.

The Court: Well, let's mark that and we'll date it and let me read it.

[Defense Counsel]: Yes, sir.

The Court: What is the State's position on the self-defense instruction?

[The State]: Judge, the State doesn't believe that there is any proof, at all, that there's any self-defense, or defense of others in this case. The witnesses testified directly regarding the defendant involved in this matter were more of the aggressors in this matter. The victim is not armed at any point throughout the total incident. As well as the fact that he was shot four times in the back. We could not agree with any self-defense, or defense of others at that point. At one point in the video Your Honor can see that the person

- 13 -

that he is claiming to be defending, I guess, Mr. Jacquez Glenn and Mr. Glenn is actually the aggressor coming after [the victim], at some point in the video, right before he is shot. And so, for the defense to conceive that he was coming at [], the victim, I think it goes against the defense of others argument and the State asks Your Honor to deny the motion to include that particular defense charge.

The Court: Who was he defending?

[Defense Counsel]: Judge, there was - even though they may not agree that he was defending Jacquez Glenn, there were two others witnesses there at the time, Rodtrez Banis, who says he stepped in between [the victim] and Jacquez Glenn and Laderious Dowell, who was also

The Court: I guess the question that I was asking was, you've asked for self-defense and defense of the others, so which one was he defending, himself, or the other person?

[Defense Counsel]: Well, I would submit that it was all three, not only himself, but others.

The Court: I guess what I am asking is what evidence do we have that he was defending himself?

[Defense Counsel]: Well Judge, we haven't determined what evidence we will put on that may show that, but I'll try to

The Court: But, can you articulate for me some evidence that would justify self-defense? And, the only reason I'm going through this is because when you talk to your client it might affect his decision?

[Defense Counsel]: Yes, Judge. The other witnesses did say that they were in fear and I believe that they have a reasonable fear that my client is also going to have a reasonable fear that something may happen to him, as well, which could lead to the self-defense.

[The State]: Your Honor, I believe they also testified that they were walking away. I believe three of the other gentleman (sic) that were with them said they were walking away, as they heard gunshots being fired. So there was no fear on their part, they were walking away from the incident that [the defendant] is claiming that he was defending. Those three gentlemen were

- 14 -

walking away when those shots were fired. Mr. Glenn said he was walking away. Mr. Banis said they were walking away and Mr. Dowell said he had already walked away and that they were all shocked that there were shots being fired.

[Defense Counsel]: Well, Your Honor, I would state that even on the video, what the State was trying to present today was that the other witnesses had not walked away, in fact, they were still standing there. We heard Sergeant Beckham pointing out where they were standing, off to the side at that time, they were walking away at any point. They're trying to make it seem like everyone walked away, but my client is standing there for no reason at all.
[The State]: Well the video did show one of the gentlemen pulling Mr. Glenn, the gentlemen in the red shirt, Mr. Glenn, away from [the victim], right before the shots started, Your Honor.

[Defense Counsel]: And I believe self-defense, I believe the jury should have a chance to decide that for themselves, it is a jury question.

The Court: It is a jury question, but the law says that before I submit a defense to the jury it must be fairly raised by the evidence. And I know that it is a very strict standard, contrary to a motion for judgment of acquittal, I am supposed to review the evidence in the light most favorable to the defendant, including drawing all reasonable inferences flowing from that evidence. And the question is whether there is any evidence which reasonable minds could accept this to such defense. It is a very – it's like the opposite of the Rule 29, that if there's anything whatsoever I'm supposed to charge it, but quite frankly I don't really think that I
have any evidence of self-defense. If the defendant doesn't testify I am afraid I'm probably not going to charge self-defense.

[Defense Counsel]: I understand, Your Honor.

The Court: I probably will charge defense of another, just out of an abundance of caution. It is extremely close there, too. We don't have any mens rea, or whatever you want to call it, there is no evidence. We have to get that from circumstantial evidence. The only person that testified that they saw what happened at the time of the shooting says that the victim's hands were in the air.

[Defense Counsel]: I understand.

- 15 -

The Court: The only person that testified about what happened at the time of the shooting said that the victim's hands were in the air. Some of these gentlemen testified at some point when [the victim] was outside the store, they couldn't see his hands and at some point when he was outside the store he might have had a hand in a pant pocket, but nobody asked the question, what did those two men see at the time of the shooting. The only person that's testified as to what was seen at the time of the shooting, that the store clerk, [the victim] did, was had his hands up in the air.

[Defense Counsel]: And, Your Honor, I think that's been disputed by the video, what his hands were doing. I think it is pretty clear on the video what he was doing.

[The State]: I don't know that the video could have shown the full side shot. We don't have the front side shot.

The Court: I'm kind of anticipating and I'm just trying to give you a preview, so that when you talk to your client, I am kind of anticipating that I am not going to charge self-defense, even if that most stringent standard. And, I realize there are cases that say that the defendant doesn't have to testify if the circumstantial evidence is sufficient to infer that he was in fear at the time. So usually those are cases, the one that comes to my mind is *Edwards versus State*, I forgot the citation of it. . . . and those are cases in which some other eye witnesses testified about exactly what was going on at the time of the shooting and I've got these young men, basically, walking away and while they have said, at some point while the man was outside they couldn't see his hand and his hand was in his pocket, one of the other guys did. No one said what the store clerk was doing at the time of the shooting, except by the one person and then we've got the video of it, so. I am kind of inclined, and I think the evidence is very weak of the third person, but I am inclined to give that one, out of abundance of caution, even if he doesn't testify. I am probably not going to give defense of the others. So with that in mind we'll let you talk to him and decide. And that could all change on what he decides to do, but I just wanted to give you a preview.

Upon our review of the record, we agree with the trial court's assessment of the proof presented during the State's case-in-chief. At the time of the defendant's request for an instruction on self-defense, the proof showed that Mr. Glenn and the victim engaged in a verbal altercation both inside and outside of the store. While inside, the victim asked Mr. Glenn to leave the store and not return. Once outside, the victim and Mr. Glenn continued to argue as the defendant began walking away from the store. However, the defendant re-

- 16 -

engaged in the conflict between Mr. Glenn and the victim by approaching the victim and shooting him. These interactions are captured on the surveillance footage which was presented to the jury. Mr. Banis, Mr. Dowell, and Mr. Glenn each testified that they were shocked by the defendant's action of shooting the victim, and that they did not see the victim holding a gun prior to the shooting. Ms. Tippett testified she saw the defendant shoot the victim as the victim held his hands in the air, noting the victim was not holding a gun at the time. Officers found eight spent shell casings and six bullet projectiles on the scene, witnesses heard numerous shots, and Dr. Ross testified the victim suffered four gunshot wounds to the back which resulted in his death. After the shooting, the defendant fled the scene. Mr. Brinkley attempted to aid the victim as he suffered on the ground. As he did so, the victim pulled a gun from either his pocket or waistband, and Sergeant Beckham identified this exchange in the surveillance footage. The victim's gun was provided to police, and Officer Wells testified he did not find any spent shell casings matching the bullets found in the victim's gun at the scene.

In viewing the evidence in a light most favorable to the defendant at this point in the trial, the record was absent any evidence to support the defense of self-defense and warrant a jury instruction on the same. Nothing in the record indicated the victim used, or even threatened, any force towards the defendant prior to the shooting, that the defendant had "a reasonable belief that there [wa]s an imminent danger of death or serious bodily injury," that "[t]he danger creating the belief of imminent death or serious bodily injury [wa]s real, or honestly believed to be real at the time," or that the defendant's "belief of danger [wa]s founded upon reasonable grounds." Tenn. Code Ann. § 39-11-611(b)(1), (2). Accordingly, the trial court did not err in denying the defendant's request for an instruction on self-defense prior to the defendant providing additional evidence to warrant the instruction.

The defendant, however, challenges the trial court's comments as a violation of his right not to testify, arguing that he "was told by the [t]rial [court] that he had to testify if he wanted the jury to be charged with a self-defense instruction." In response, the State asserts "[t]he trial court did not deny the defendant his right not to testify, but properly informed him that the evidence presented in the State's case in chief did not support an instruction on self-defense, and that unless the defendant provided such evidence during his testimony, the instruction would not be given." Upon our review, we agree with the State. In evaluating the comments as a whole, the record indicates the trial court informed the parties that the proof presented during the State's case did not warrant an instruction on self-defense and that it would not instruct the jury on self-defense absent additional evidence presented by the defendant to support the same. Accordingly, the trial court's comments did not infringe upon the defendant's right not to testify, but rather provided the reasoning for its ruling.

Though the trial court expressed its decision in less than desirable terms, we find the trial court's language harmless considering the overwhelming amount of proof supporting the defendant's conviction as detailed throughout this opinion. We also note, the trial court conducted a proper *Momon* hearing during which the defendant expressed his desire to testify. Further, the State offered rebuttal proof from Sergeant Beckham concerning the details of the defendant's May 17, 2017, statement and the defendant's equivocation as to whether he saw the victim with a gun prior to the shooting. Finally, the trial court ultimately charged the jury with the instruction on self-defense which the jury clearly rejected in reaching its verdict. Accordingly, the trial court's comment was harmless and this issue is without merit.

We acknowledge that "the genuineness of the defendant's fear could be demonstrated by the 'circumstances' of the confrontation." *State v. Cole-Pugh*, 588 S.W.3d 254, 263 (Tenn. 2019) (citing *State v. Edwards*, C.C.A. No. 1127, 1987 WL 28039, at *1 (Tenn. Crim. App. Dec. 17, 1987)). And, "[c]ompelling the defendant to waive his right not to give evidence against himself or, instead, to provide evidence of his mental state to secure his constitutional right to a complete jury instruction is an untenable position." *Cole-Pugh*, 588 S.W.3d at 263. However, based upon the record presented prior to the trial court's comment at issue here, we are of the opinion that the circumstances of the confrontation as presented during the State's case-in-chief did not establish the genuineness of the defendant's fear. *Id.* Rather, the proof demonstrated that immediately before the shooting, the victim engaged in a verbal confrontation with Mr. Glenn that did not involve the defendant. The defendant observed the victim and Mr. Glenn arguing, approached the victim, and then fired multiple shots at him, resulting in his death. Accordingly, we find the trial court's comment was harmless and the circumstances of the confrontation did not warrant a self-defense instruction at this point in the trial. The defendant is not entitled to relief.

## III.    Sentencing

The defendant argues the trial court imposed an excessive sentence of twenty-four years' incarceration in violation of the purposes and principles of sentencing. The defendant further asserts the trial court improperly weighed the applicable enhancement and mitigating factors and that the twenty-four-year sentence "does not achieve the goals of rehabilitating [the defendant] nor does it comply with sentencing practices for similar offenses in Tennessee." The State disagrees, arguing the trial court imposed a within-range sentence after considering the purposes and principles of sentencing pursuant to the Tennessee Criminal Sentencing Reform Act. Again, we agree with the State.

It is well settled that this Court reviews within-range sentences imposed by the trial court under an abuse of discretion standard with a presumption of reasonableness. *State v.*

*Bise*, 380 S.W.3d 682, 707 (Tenn. 2012); *State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012). Once the trial court has determined the appropriate sentencing range, it "is free to select any sentence within the applicable range." *State v. Carter*, 254 S.W.3d 335, 343 (Tenn. 2008) (citing Tenn. Code Ann. § 40-35-210(d)). When determining a defendant's sentence and the appropriate combination of sentencing alternatives, trial courts are to consider the following factors:

> (1) The evidence, if any, received at the trial and the sentencing hearing;
> (2) The presentence report;
> (3) The principles of sentencing and arguments as to sentencing alternatives;
> (4) The nature and characteristics of the criminal conduct involved;
> (5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114;
> (6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee;
> (7) Any statement the defendant wishes to make in the defendant's own behalf about sentencing; and
> (8) The result of the validated risk needs assessment conducted by the department and contained in the presentence report.

Tenn. Code Ann. § 40-35-210(b). The trial court must state on the record the statutory factors it considered and the reasons for the ordered sentence. Tenn. Code Ann. § 40-35-210(e); *Bise*, 380 S.W.3d at 705-06. "Mere inadequacy in the articulation of the reasons for imposing a particular sentence, however, should not negate the presumption [of reasonableness]." *Bise*, 380 S.W.3d at 705-06. A trial court's sentence "should be upheld so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Id.* at 709-10.

Here, the trial court sentenced the defendant to twenty-four years' incarceration as a Range I offender for the Class A felony of second-degree murder. Tenn. Code Ann. § 39-13-210(c)(1). As a Range I offender, the defendant faced a sentencing range between fifteen and twenty-five years. Tenn. Code Ann. § 40-35-112(a)(1). As such, the twenty-four-year sentence imposed by the trial court falls within the applicable sentencing range for the defendant's offense and is presumed reasonable by this Court. *Bise*, 380 S.W. 3d at 707; *Caudle*, 388 S.W.3d at 278-79.

Before imposing the defendant's sentence, the trial court weighed the applicable enhancement and mitigating factors:

All right. Well, he's a range one standard offender. I have to sentence him somewhere between 15 and 25 years. And I -- in doing so, I look at the principles of sentencing that have been established. When determining the specific sentence to impose within a range of punishment, the sentencing judge shall consider [but] is not bound by the following advisory sentencing guidelines:

Number one, the minimum sentence within the range is the sentence which should be imposed.

And number two, the sentence length within the range should be adjusted as appropriate by the presence or absence of mitigating and enhancement factors.

In addition, the sentence length within the range should be consistent with the general purposes and principles of the sentencing -- 1989 Sentencing Act. The statute provides that these guidelines shall be considered, but the [c]ourt is not bound by them, thus consideration of the guidelines is mandatory. However, the guidelines remain advisory and the trial judge retains the discretion to sentence a defendant anywhere within the appropriate range, so long as the length of that sentence is consistent with the purposes and principles of the Sentencing Act. And those purposes and principles include the imposition of a sentence justly deserved in relation to the seriousness of the offense. A punishment sufficient to prevent crime and promote respect for the law in consideration of the defendant's potential or lack of potential for rehabilitation. Accordingly, the defendant is not entitled to a minimum sentence as a matter of law, even when there is no applicable sentence.

In addition, when sentencing, the judge must look at the evidence presented at the trial and at the sentencing hearing, the presence report which we've marked Exhibit A, the bond report, which shows some additional information which we've marked Exhibit B, the certificates the defendant has earned which we've marked Exhibit C.

Also to be considered are the nature and characteristics of the criminal conduct involved, any enhancement and mitigation factors which apply to the case, any statistical information provided by the Administrative Office of the Courts for similar offenses committed in Tennessee, any statement the

defendant wishes to make on his behalf, and the results of the risk and needs assessment that was conducted. In this case, that risk and needs showed that there was a -- a low likelihood of re-offending.

As far as the enhancement factors that apply, I do find that the defendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range. In this case, he has a vandalism, prior vandalism. I find number -- I don't know whether you listed it 8 or 13, but bottom line is, while he was on an alternative sentence he not only possessed a weapon but he also used it to commit a second[-]degree murder, which I -- I find -- I -- I have to put a lot of weight on that one.

Number nine, the defendant possessed or employed a firearm, explosive device, or other deadly weapon during the commission of the offense. That one is also clearly applicable.

Number ten, the defendant had no hesitation about committing a crime when the risk to human life was high. That one I'm a little reluctant on. The [a]ppellate [c]ourts say that with regard to second[-]degree murder, that's inherent in the crime itself. And short of there being something unusual, just because you murder somebody, that one's not applicable, generally speaking. I -- I will say this. I hesitate about not using that one in the sense that the number of shots that were fired are astronomical. I forgot how many shell -- was it eight or nine shell casings that were fired? We witnessed the video. At least six shots hit the door and -- and the shooting appears from the video to be the defendant running up on the victim, not remaining stationary or running away, but actually trying to run up on the victim. But anyway, I'm not going to put any weight on that one out of an abundance of caution because it is somewhat inherent in every second[-]degree murder.

As far as mitigating factors are concerned, the -- I'm going to give weight to almost everything that you said, except some of them I'm going to reject.

Number two, the defendant acted under strong provocation. I think he might've been provoked, but it wasn't strong provocation. What appeared to me to happen was this man disrespected his buddy and he wasn't going to have any part of him disrespecting his buddy. And so, the gun that he armed himself with, he decided to kill this man. I'm not putting any -- I don't buy this strong provocation.

Number three, substantial grounds exist tending to excuse or justify the defendant's criminal conduct, though failing to establish a defense for much of the same reasons, including the -- the independent witness who testified at the time the victim was initially shot, he had his hands like this in the air. What we see on the video's not 100 percent clear, but it seems to support that. It doesn't show a gun in his hand. What we do see of the hand is a gun, empty, but it's sometimes going down this -- this way, sometimes not. But we don't really see it, the exact point of the shooting. We're not in a position to see the hands up in the air, but the -- the -- I don't have evidence to the contrary. I have affirmative evidence that I believe, and the jury chose to accredit, and I accredit, that at the time that this man was shot, his hands were in the air as if saying, you know, don't shoot, don't shoot. Not saying that, but you know, I – I don't know how the records are going to reflect me holding the -- my hands up about this -- about where my face is with my palms directed away from me. I don't put any weight on that one.

I -- I do put some as I said on everything else that you've said, including his certificates. He has no prior felonies, he's 24 years old, all the things that you listed in your written motion for mitigating factors. I will give him some weight for turning himself in and locating his clothing. I don't really -- I don't know how to offset that with the fact that he dumped the gun that was used, sold the gun. But anyway, I'll give him some mitigation for that.

I don't think 11 is applicable. I -- the -- 11 says the defendant, although guilty of the crime, committed the offense under such unusual circumstances that it is unlikely that a sustained intent to violate the law motivated the criminal conduct. I don't think this is that unusual circumstance.

Matter of fact, in our society here in Shelby County, kids arm themselves with guns without permits all the time. And they get into beefs and scuffles, and they disrespect one another and one pulls out a gun and shoots the other one. Most of the time, they miss because they can't shoot worth a dime. They've watched on [television] that you shoot a gun sideways or upside down. He says he's never shot a gun before. I don't know whether he has or not, but apparently, he's such a bad shot that he had to run up on the man and shoot him at point-blank range, so -- so close to him.

And all the evidence seems to be that he missed with the initial shots when -- he didn't hit him until -- and hit him in the back after he ran up on him. The jury found beyond a reasonable doubt that this was not self-defense. I think the jury got it right based upon the facts of this case.

- 22 -

I don't know what to do with the fact that I think he committed perjury in the course of the trial, committed perjury today. I don't know -- I guess that bears on his rehabilitation, but I think what the proof showed is he got angry because his buddy was disrespected, and for him to be a man, he had to do something about it.

Anyway, you weigh the aggravation, you weigh the mitigation, you weigh the seriousness of this offense. And I'm going to sentence him to 24 years in -- in this matter.

As evidenced above, in sentencing the defendant, the trial court properly and thoroughly weighed the applicable enhancement and mitigating factors and considered the statutory factors required under Tennessee Code Annotated section 40-35-210(b). Though the defendant disputes the weight the trial court gave to the applicable enhancement and mitigating factors and asserts the sentence is excessive, we find nothing in the record to indicate the trial court abused its discretion in sentencing the defendant. *Bise*, 380 S.W.3d at 707. Furthermore, our supreme court has made clear "mere disagreement with the trial court's weighing of the properly assigned enhancement and mitigating factors is no longer a ground for appeal." *Bise*, 380 S.W.3d 682, 706 (Tenn. 2012). Accordingly, the defendant is not entitled to relief, and we affirm the twenty-four-year sentence to be served in the Tennessee Department of Correction.

### *Conclusion*

Based on the foregoing authorities and reasoning, we affirm the judgment of the trial court.

_____
J. ROSS DYER, JUDGE